# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **JOHN BAIRD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No 09-cv-5764** |
| **MICHAEL ASTRUE, Commissioner of** | ) | |
| **Social Security,** | ) | **Magistrate Judge Susan E. Cox** |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, John Baird, DDS, ("plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Social Security Disability Insurance Benefits ("DIB"). Plaintiff filed a Motion for Summary Judgment and seeks a judgment reversing or remanding the Commissioner's final decision [dkt. 14]. For the reasons set forth below, plaintiff's motion is granted and this case is remanded for further proceedings.

## I.      Procedural History

Plaintiff filed an application for DIB on April 9, 2004, for a period of disability beginning November 1, 2002.[1] Plaintiff, a former oral and maxillofacial surgeon, alleged disability because of bipolar disorder and, as a result, "inability to perform surgical and anesthesia procedures."[2] His claim was denied initially and on reconsideration.[3] A request for an Administrative Law Judge ("ALJ") hearing was timely filed on November 6, 2004.[4] ALJ Edward Pappert held a hearing on

---

[1] R. at 98.
[2] R. at 114, 121.
[3] R. at 63-67, 73-76.
[4] R. at 77.

January 17, 2006, in Evanston, IL.[5] Plaintiff, as well as a vocational expert, appeared and testified at the hearing.[6] In his April 28, 2006, decision, the ALJ found that plaintiff was still functionally capable of performing jobs that existed in significant numbers in the national economy.[7] As a result, the ALJ concluded that plaintiff was not disabled within the meaning of the Social Security Act and not entitled to DIB.[8]

Plaintiff then filed a Request for Review.[9] On November 17, 2006, upon finding several errors with the ALJ's decision, the Appeals Council remanded the case for further proceedings.[10] The second hearing before ALJ Pappert was held on March 27, 2007.[11] Plaintiff, a medical expert, as well as a vocational expert appeared and testified at that hearing.[12] In his October 22, 2007, decision, the ALJ found that plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy."[13] For this reason, the ALJ again concluded that plaintiff was not disabled and not entitled to DIB.[14]

Next, plaintiff timely filed a request for review of the second decision of the ALJ.[15] This request was denied on July 14, 2009 because the Appeals Council "found no reason" to review the ALJ's decision.[16] Therefore, the second ALJ's decision was the final decision of the Commissioner.

On September 16, 2009, plaintiff filed this action for a judicial review of the final decision

---

[5] R. at 415-36.
[6] *Id.*
[7] R. at 330.
[8] R. at 320-30.
[9] R. at 334, 337-39.
[10] R. at 341-44.
[11] R. at 437-75.
[12] *Id.*
[13] R. at 23.
[14] R. at 8-24.
[15] R. at 360-60B.
[16] R. at 4.

of the Commissioner. The Commissioner answered the complaint on December 7, 2009. Plaintiff subsequently filed a motion for summary judgment seeking a reversal or remand of the Commissioner's final decision based on purported errors with the ALJ's second decision. In his motion, plaintiff argues that reversal of the Commissioner's decision is warranted because the ALJ failed to properly: (1) analyze the opinion of plaintiff's treating psychiatrist; (2) explain why plaintiff was found to be "not entirely credible;" (3) analyze evidence relating to plaintiff's work limitations, and; (4) resolve conflicts between the vocational expert's testimony and the *Dictionary of Occupational Titles* ("DOT").[17]

In response, the Commissioner initially filed a motion to remand acknowledging that the vocational expert's testimony was unclear as to how many jobs plaintiff could perform. Plaintiff opposed the motion to remand because it did not address several other arguments raised in his motion for summary judgment. We denied the Commissioner's motion to remand and his subsequent motion to reconsider. Adopting the reasoning of *Gaspari v. Astrue*,[18] we held that "from the standpoint of judicial economy, it would seem to make more sense to consider all of the issues raised before deciding whether remand is appropriate," and that plaintiff was "entitled 'to judicial review of the entirety of the ALJ's decision, not just those aspects the Commissioner chooses to emphasize.'"[19] The Commissioner subsequently filed a response to plaintiff's motion for summary judgment addressing all of the issues raised by plaintiff.

---

[17] The Dictionary of Occupational Titles ("DOT"), published by the Department of Labor, gives detailed physical requirements for a variety of jobs. The Social Security Administration has taken "administrative notice" of the DOT. *See* 20 C.F.R. § 416.966(d)(1).

[18] 06 C 5292 (N.D. Ill. Apr. 30, 2007).

[19] Minute Order, dkt. 19 (citing *Gaspari,* 06 C 5292).

## II.    Factual Background

The facts set forth in this section are derived from the administrative record. They provide a review of plaintiff's background, which reflects the reasons he applied for disability. The section also provides an overview of plaintiff's psychiatric and other medical problems.

### A.    Plaintiff's Current Condition

Plaintiff was born on March 11, 1942, making him sixty-five years old on the date of the second and final ALJ decision.[20] At the time of the first hearing before the ALJ, plaintiff was married and lived together with his wife and her two daughters, who were twelve and eighteen years old.[21] Plaintiff was employed as an oral and maxillofacial surgeon since 1968.[22] However, he had not worked since November of 2002 because of bipolar disorder and his "inability to perform surgical and anesthesia procedures."[23]

The record revealed that plaintiff's average day consisted of spending a certain percentage of the time on the computer, watching TV or rental movies and reading novels.[24] Although he was able to care for himself, plaintiff had a live-in housekeeper who assisted him with housework and meal preparation.[25] As needed, plaintiff performed minor and minimal repairs around the house.[26] He had a driver's license and was able to drive.[27] He was able to leave home alone, when necessary, to do errands and keep appointments.[28] He had lunch with friends on occasion, specifically he

---

[20] R. at 419.
[21] R. at 419-20.
[22] R. at 114, 118, 420.
[23] R. at 114, 121.
[24] R. at 423.
[25] R. at 137, 146, 153, 179.
[26] R. at 137.
[27] R. at 420.
[28] R. at 139.

testified to going out about every two weeks.[29] However, he complained that he lost some interest in reading, fixing things, social activities and his hobbies in "boats" and "computers."[30]

## B.     Plaintiff's Psychiatric Problems

Plaintiff was diagnosed with bipolar disorder in December 1989.[31] Since 1996, he had been in consistent psychotherapy treatment with Elizabeth V. De Sa Pereira, M.D., a psychiatrist.[32] Plaintiff was prescribed 1200 milligrams of Lithium a day, fifty milligrams of Seroquel in the evening, two milligrams of Clonazepam a day, and 0.112 milligrams of Synthroid a day.[33]

Dr. De Sa Pereira's medical records, which were made part of the record, reflected the treatments plaintiff had received and the history of his illness.[34] In evaluating plaintiff's impairment, Dr. De Sa Pereira prepared a Mental Disorder Report for Disability Determination Services on July 26, 2004 ("Mental Disorder Report").[35] In her Mental Disorder Report, she described plaintiff as easily irritated, angered, and frustrated with little or no tolerance.[36] She stated that plaintiff's disorder restricted his daily activities because he was not able to do small tasks, including tasks that he was capable of doing in the past.[37] Dr. De Sa Pereira opined that plaintiff's failure to complete tasks resulted from his disorder and impacted his ability to sustain concentration and attention.[38] She further opined that plaintiff was not able to function in a competitive work setting on an eight-hour per day, five days per week basis.[39] She noted that plaintiff was tired at times and experienced GI

---

[29] *Id.*
[30] R. at 139, 146.
[31] R. at 116, 179.
[32] R. at 179.
[33] R. at 170, 454-56.
[34] R. 204-43, 302-18.
[35] R. 200-03.
[36] R. at 200.
[37] *Id.*
[38] *Id.*
[39] R. at 201.

problems as side effects from prescribed medications.[40] However, Dr. De Sa Pereira also stated in her report that with treatment plaintiff's mood and irritability had improved and that plaintiff lived alone with limited support.[41]

Also include in her Mental Disorder Report, Dr. De Sa Pereira evaluated symptoms and signs of depressive, manic, and bipolar syndromes.[42] She indicated that plaintiff had "difficulty concentrating or thinking," "psychomotor agitation or retardation," "inflated self-esteem" and, in the past, he was involved in "activities with high probability of painful consequences which were not recognized."[43] With regard to functional limitations related to affective disorder, she indicated that plaintiff had "marked restriction of activities of daily living" and "marked difficulties in maintaining concentration, persistence or pace."[44] She also put a checkmark next to the question regarding whether plaintiff had "a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," and "a residual disease process resulting in marginal adjustment that even a small increase in mental demands or change in environment would be predicted to cause decompensation."[45]

Plaintiff's mental condition was also evaluated by State Disability Determination Services.[46] On a mental status exam performed by Jarrold Heinrich, Ph.D., and reviewed by Carl A. Hermsmeyer, Ph.D, a psychiatrist, it was determined that plaintiff's cognitive functioning was fully intact; he was able to complete all essential activities independently; he could understand,

---

[40] R. at 200.
[41] R. at 201.
[42] R. at 203; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1.
[43] R. at 203.
[44] *Id.*
[45] *Id.*
[46] R. at 283-300.

remember, and execute detailed instructions; he was able to concentrate and persist adequately on tasks within an organized work setting; he could adjust to routine changes in his environment as long as they were not too frequent; and he had adequate social skills.[47] However, plaintiff lacked the emotional temperament to "maintain harmonious interactions with others" and, as a result, he needed a "job that did not require frequent interactions with others."[48] The report concluded that plaintiff retained the mental and behavioral capacity to do detailed tasks within the limitations noted.[49]

### C.      Plaintiff's Other Medical Problems

The administrative record includes medical records that also disclose that plaintiff has had a history of diverticulosis, internal hemorrhoids, and hypothyroidism.[50] Plaintiff had been a smoker and his pulmonary function test revealed that his lungs showed an age of 114 years.[51] His spirometry report showed mild obstructions, and a chest x-ray showed "hyperinflation bilaterally, negative for focal consolidation," and "mild linear scarring and/or subsegmental atelectasis in the right upper lobe."[52] An open MRI of the brain, which plaintiff underwent for evaluation of confusion, was normal with "no mass lesions or areas of pathologic contrast enhancement."[53]

## III.     Administrative Proceedings

This section outlines the proceedings at the two administrative hearings held in this case. The first hearing was held before the ALJ on January 17, 2006. After the ALJ issued an unfavorable decision, plaintiff filed a request for review. The Appeals Council remanded,  finding errors with the ALJ's decision. Accordingly, there was a second hearing before the ALJ on March 27, 2007.

---

[47] R. at 299.
[48] R. at 299.
[49] *Id.*
[50] R. at 187, 201, 277.
[51] R. at 257-58.
[52] *Id.*
[53] R. at 272.

## A. The ALJ Hearing held on January 17, 2006

The first hearing before ALJ Pappert was held on January 17, 2006, in Evanston, IL.[54] Plaintiff, represented by an attorney, Jim P. Brown, appeared and testified at the hearing.[55] A vocational expert, Christopher Yep, also appeared and testified at the hearing.[56] The ALJ issued his decision on April 28, 2006. The subsections below provide a review of the testimonies of plaintiff and Mr. Yep, as well as the ALJ's April 28, 2006, decision.

### 1. Testimony of Plaintiff

After several background questions, the ALJ asked plaintiff to explain the primary reason he could not return to his work as an oral surgeon, and to explain difficulties and limitations that prevented him from performing work as an oral surgeon.[57] Plaintiff testified that in 2002 he found it more and more difficult to complete surgical procedures and to administer the outpatient anesthetics.[58] Although, he had no "ill results" in performing the procedures, he reached a point toward the end of 2002 where he got so frustrated that he would have to stop the procedure, take a break and come back to it to finish.[59] While he had difficulties completing the procedures, he was always able to complete them.[60] Plaintiff was frustrated that the same surgical technique applied to the same problem did not always produce the result he expected, that he felt he was "on the edge of possibly causing some collateral damage."[61] Plaintiff's employees then started to monitor him per his business partner's request .[62] Plaintiff testified that he was in denial at that point and did not

---

[54] R. at 415-36.
[55] R. at 415-29.
[56] R. at 429-32.
[57] R. at 420.
[58] *Id.*
[59] R. at 420-21.
[60] R. at 421.
[61] *Id.*
[62] *Id.*

admit or accept anything.[63] Later, plaintiff's business partner became involved and eventually

convinced plaintiff to take some time off.[64] Plaintiff did not return to work after taking this break.[65]

Plaintiff testified that the same type of situation happened with non-surgical activities, such

as household projects.[66] Although he had done some projects many times before, they had become

very difficult for him to get done.[67] In trying to perform other projects plaintiff would get so

aggravated that things were not responding to his approach that he would "want to slam thing[s] on

the floor."[68] Plaintiff also believed that the final results of some of his projects were not of the same

quality they would have been ten years previous.[69]

The ALJ asked plaintiff how he spent his time.[70] Plaintiff testified that he spent a certain

percentage of his time on the computer, watched TV or rental movies and read novels.[71] The ALJ

then asked plaintiff whether his condition remained the same or whether it had gotten a little better

or worse since he stopped working.[72] Plaintiff testified that he had difficulty getting adjusted to

medications.[73] However, he did not feel out of control or "raging" since his treating psychiatrist

found the right combination of medications.[74] The medications kept him stable as the peaks of highs

and lows had been removed.[75] Plaintiff also testified that even before his condition was stabilized

---

[63] Id.

[64] Id.

[65] Id.

[66] Id.

[67] Id.

[68] R. at 422.

[69] R. at 423.

[70] Id.

[71] Id.

[72] Id.

[73] Id.

[74] R. at 432-33.

[75] R. at 424.

with medications, he never expressed any aggressive behavior or violence, he always kept it inside.[76]

The ALJ asked plaintiff if he had "any other physical ailments or difficulties" of which the ALJ was not aware from the record.[77] Plaintiff responded "no" and added that he was "fortunately healthy."[78] Plaintiff was also not aware of any adverse side effects from the medications he was taking.[79]

Next, the ALJ explained that finding plaintiff disabled required not only finding that plaintiff was unable to perform his past work, but also that plaintiff was unable to perform any work that existed in "any significant numbers in any regional economy in our society."[80] Such work, in plaintiff's case, would be "simple, unskilled work at even the medium level of exertion."[81] Accordingly, the hearing turned to the issue of what plaintiff felt would prevent him from performing simple, unskilled work.[82]

The ALJ asked plaintiff whether he believed he would be unable to work as a result of disagreements with coworkers or supervisors.[83] Plaintiff responded that his "inability to work with people" might prevent him from performing simple, unskilled work.[84] He added that changes in his personality, which had caused him to become argumentative and hyper critical of others, might hurt his work relationships.[85] As an example, plaintiff testified that he used to have twenty to twenty-five "pretty good" friends at a yacht club, but now only had "four or five" who were willing to put up

---

[76] R. at 433-34.
[77] R. at 424.
[78] *Id.*
[79] R. at 426.
[80] R. at 424.
[81] R. at 425.
[82] *Id.*
[83] R. at 426.
[84] R. at 425-26.
[85] *Id.*

with him.[86]

Next, in response to questions from plaintiff's attorney, plaintiff testified that his tendency to overreact to insignificant things might also prevent him from performing simple, unskilled work.[87] Plaintiff testified that if a supervisor gave him a task to perform in a certain manner, but he knew of a different manner, he would react negatively even if the difference was insignificant.[88] Elaborating on his tendency to overact, plaintiff provided an example of having a "severe" reaction over insignificant changes around his house.[89] He also testified to yelling at his previous housekeeper over insignificant things.[90]

### 2. Testimony of Vocational Expert, Christopher Yep

Christopher Yep, an impartial vocational expert witness, also appeared and testified at the hearing on January 17, 2006.[91] First, Mr. Yep noted that plaintiff's past relevant work of an oral surgeon was skilled and performed at a light level of exertion with no skills transferable to a lesser exertional level.[92] Mr. Yep then testified that plaintiff was unable to perform his past work.[93] Next, the ALJ posed a hypothetical to Mr. Yep, which was based on plaintiff's impairments and limitations.[94] The ALJ wanted to know whether the hypothetical individual would be able to perform plaintiff's past work.[95] Mr. Yep testified that he would not be able to but based on the ALJ's hypothetical there existed other work that he would be able to perform, such as janitorial work or

---

[86] R. at 425.
[87] R. at 427.
[88] R. at 428.
[89] R. at 427.
[90] R. at 428.
[91] R. at 429-32.
[92] R. at 429.
[93] R. at 430.
[94] *Id.*
[95] *Id.*

laundry laborer work.[96] Next, in response to questions by plaintiff's attorney, Mr. Yep noted that a marked limitation in a person's ability to respond to changes in the work setting "would eliminate the jobs" he identified for plaintiff "because the individual would still have to respond to some sort of changes on a day to day basis."[97]

### 3.     The ALJ's Decision of April 28, 2006

In his decision of April 28, 2006, the ALJ evaluated plaintiff's claim for disability by following the five-step process outlined by the Social Security Regulations in 20 C.F.R. § 404.1520(a).[98] Under the Regulations the ALJ must consider: first, whether the claimant is presently engaged in substantial gainful activity; second, whether the claimant has a severe impairment or combination of impairments; third, whether the claimant's impairments meet or equal an impairment listed in the regulations for being severe enough to preclude gainful activity; fourth, whether the claimant is unable to perform her past relevant work; and finally, whether the claimant is unable to perform any other work that exists in significant numbers in the national economy.[99] A finding of disability requires an affirmative answer at either step three or step five, while a negative answer at any step other than step three precludes a finding of disability.[100]

Following the five-step process outlined by the Regulations, the ALJ first found that plaintiff was insured for benefits through the date of the decision.[101] The ALJ then determined that plaintiff had not engaged in substantial gainful activity since the alleged onset of disability.[102] Next, the ALJ found that plaintiff's "affective/mood disorder" was a "severe" impairment; however, it did not meet

---

[96] *Id.*

[97] R. at 432.

[98] R. 324-29.

[99] *See* 20 C.F.R. §§ 404. 1520, 416.920.

[100] *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir.1992).

[101] R. at 329.

[102] *Id.*

or medically equal one of the listed impairments.[103] Based on plaintiff's residual functional capacity ("RFC")[104], his ability to do physical and mental work activities despite limitations from his impairment, the ALJ concluded that plaintiff was unable to perform his past relevant work, but was still able to perform work that existed in significant numbers in the national economy.[105] The ALJ specified, for example, that plaintiff could work as a janitor or as a laundry laborer worker.[106] As a result, the ALJ concluded that plaintiff was not under a "disability" and he had no exertional limitations.[107] Therefore, plaintiff was not entitled to DIB.[108]

## B.     The ALJ Hearing held on March 27, 2007

The second administrative hearing was held upon remand from the Appeals Council after the unfavorable decision of April 27, 2006. The hearing took place before ALJ Pappert on March 27, 2007, in Evanston, Illinois. Plaintiff, again represented by Mr. Brown, testified at the hearing. Also testifying were medical expert, Daniel Schiff, M.D., ("ME") board certified in psychiatry, and vocational expert ("VE"), Frank Mendrick, a certified rehabilitation counselor. The subsections below provide a review of the testimonies of plaintiff, the ME and the VE.

### 1.     Testimony of Plaintiff

The hearing began with testimony from plaintiff.[109] After answering some background questions from the ALJ, plaintiff testified to having a diminished social life and an inability to keep friendships since the disability onset date.[110]  He attributed his diminished social life to the fact that

---

[103] *Id.*

[104] 20 C.F.R. § 416.945.

[105] R. at 330.

[106] R. at 329-30.

[107] R. at 330.

[108] *Id.*

[109] R. at 446-53.

[110] R. at 446-47.

he often found social experiences aggravating.[111] For example, plaintiff testified that he used to enjoy going to restaurants frequently, but he no longer did so because he would get aggravated by the level of service.[112] Even though plaintiff had gotten aggravated by the service, he testified that he kept it inside himself because his family was with him.[113] As to his trouble keeping friends, he testified that he was not sure of the exact reason for such trouble.[114] Plaintiff only noted that his friendships "essentially dissolved" in the last five years.[115]

Plaintiff also testified to problems with his memory and concentration.[116] For example, he testified that he had problems remembering names, remembering scientific terminology he used to know well, and losing things around the house.[117] He further testified that these memory problems caused him to become irritable or go in a rage, when, for example, he could not find something.[118]

Next, in response to his attorney's question about his ability to perform unskilled work, plaintiff testified that he might have difficultly performing such work because it would require working with a supervisor.[119] In this regard, plaintiff testified that he might have difficultly remembering or accepting instructions from a supervisor, depending on the supervisor's personality and level of education.[120]

### 2. Testimony of Medical Expert, Daniel Schiff, M.D.

Before giving his opinion on plaintiff's condition, the ME asked plaintiff several questions.[121]

---

[111] R. at 447-48.
[112] *Id.*
[113] R. at 447.
[114] R. at 448-49.
[115] R. at 448.
[116] R. at 449-50.
[117] R. at 449-51.
[118] R. at 450.
[119] R. at 451-53.
[120] *Id.*
[121] R. at 450-63.

First, he asked plaintiff about his past work and medications he was taking.[122] Plaintiff testified that he used to give anesthesia through intravenous and spinal injections.[123] Plaintiff then identified medications he was prescribed, and testified that he was not aware of any side effects from these medications.[124] Plaintiff added that his thyroid condition was stabilized by the medication.[125] In response to the ME's question whether plaintiff could still perform some of his past work tasks, for example, perform intravenous injections, draw blood, or review a dental record, plaintiff responded that he probably could perform such tasks.[126] Plaintiff added that he did not have a tremor as a side effect from his medications, nor did he have other dysfunctions that would keep him from performing such tasks.[127]

The ME then questioned plaintiff about his mood, irritability and loss of temper. Plaintiff testified that he had never done anything "in a mood" which he regretted later after he calmed down.[128] For example, plaintiff stated that he never bought anything he could not afford.[129] As to his irritability and loss of temper, plaintiff testified that when he became irritable, he might swear and say something, but he had never hit nor attacked anyone personally.[130]

Next, the ME testified as to plaintiff's condition. The ME admitted that he was not able to read a portion of Dr. De Sa Pereira's notes because of her handwriting.[131] He was also not able to understand another portion of her notes because "they refer[red] to things that were rather personal"

---

[122] R. at 454.
[123] *Id.*
[124] R. at 454-56.
[125] R. at 455-56.
[126] R. at 459.
[127] R. at 458.
[128] R. at 458-59.
[129] *Id.*
[130] R. at 457-58.
[131] R. at 460.

and he could not "track it through the record."[132] However, he testified that the record was "relatively consistent for some degree of a bipolar problem."[133] The ME further testified that Dr. De Sa Pereira's notes revealed that plaintiff had ups and downs, stable at times and angry and verbal at other times.[134] The ME also noted that Dr. De Sa Pereira repeatedly, through her notes, called plaintiff "grandiose"; however, he did not know what that meant.[135]

The ME then opined that plaintiff still possessed skills and he might be able to perform tasks that involve "very brief social contacts," for example, "he could draw blood for lab tests," or "he might be able to review dental records."[136] In the ME's view, even though plaintiff had "some degree of trouble in any kind of ongoing relationships," he might still be able to do some work.[137] In support of his opinion, the ME pointed to plaintiff's testimony that he might be able to work under a supervisor he respected.[138] The ME further opined that plaintiff's trouble with remembering names could be from aging and transient "non aphasia" (though the transcript of the hearing notes that this term was inaudible).[139] With regard to plaintiff's complaint that he talked too much, the ME opined that plaintiff's speech and behavior during the hearing led the ME to conclude that plaintiff did not have "a pressure of speech" problem.[140]

The ME then testified that plaintiff's condition met the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1 "in terms of the phenomenon" because plaintiff had a bipolar disorder which

---

[132] *Id.*
[133] *Id.*
[134] *Id.*
[135] R. at 460, 465.
[136] R. at 460-61.
[137] *Id.*
[138] *Id.*
[139] R. at 461.
[140] R. at 462.

was tracked over a length of time by his treating psychiatrist.[141] However, plaintiff's condition did not meet the requirements of the "paragraph B" criteria because plaintiff had only a moderate limitation in social functioning "because of the things... he could do that [were] transient in terms of activities for doing a task."[142] The ME testified that plaintiff had a mild limitation of activities of daily living because he did things, such as driving a car, taking care of himself and grooming himself.[143] The ME then testified that plaintiff had moderate to marked limitation in concentration, persistence and pace.[144] The ME added that this last limitation had "destroyed [plaintiff's] ability to practice his profession" because "he couldn't do the procedures, complicated procedures he used to do."[145]

The ME also testified that plaintiff's condition did not meet the requirements of the "paragraph C" criteria.[146] For example, the ME testified that repeated episodes of decompensation were not present and there was no evidence that marginal adjustments or even minimal increases in mental demands or changes in the environment would be predicted to cause plaintiff to decompensate.[147] According to the ME, there was also no evidence in the record of a current history of one or more years of inability to function outside a highly supported living environment.[148]

Finally, the ALJ read to the ME the hypothetical he was going to pose to the VE and asked the ME if it was "too restrictive or too liberal."[149] The ME testified that the hypothetical "would be fair."[150]

---

[141] 20 C.F.R. Pt. 404, Subpt. P, App. 1; R. at 461.
[142] 20 C.F.R. Pt. 404, Subpt. P, App. 1; R. at 462.
[143] R. at 462.
[144] *Id.*
[145] *Id.*
[146] 20 C.F.R. Pt. 404, Subpt. P, App. 1; R. at 462-63.
[147] R. at 463.
[148] *Id.*
[149] R. at 463-64.
[150] R. at 464.

### 3.    Testimony of Vocational Expert, Frank Mendrick

First, the VE testified that plaintiff's past relevant work of an oral surgeon was skilled and universally done at the light level according to the DOT.[151] Next, the ALJ posed a hypothetical question to the VE.[152] The ALJ asked whether an individual having the following characteristics and limitations could perform the past work identified for plaintiff: (1) sixty to sixty-five years old; (2) education and past relevant work experience equivalent to plaintiff; (3) limitation in inability to maintain attention and concentration necessary for detailed or complex tasks on a sustained basis; (4) moderate limitation in terms of ability to interact appropriately with the general public; (5) moderate limitation in terms of ability to get along with coworkers or peers without distracting them or exhibiting behavior extremes; (6) moderate limitation in terms of being able to work in coordination with or proximity to others without being distracted by them; (7) moderate limitation in terms of ability to respond appropriately to changes in the work setting and to accept instructions and respond appropriately to criticism from supervisors; and (8) interactions were limited to less than occasionally, and each interaction lasted five to ten minutes maximum.[153]

Based on the ALJ's hypothetical the VE testified that the hypothetical individual would not be able to perform plaintiff's past work, but would be able to perform simple unskilled work.[154] The VE further explained that a majority of the jobs he identified were at the light level of exertion, mainly in a factory setting.[155] These were simple bench work positions "with one, two, three-step work operations."[156] The person working in such a position was responsible solely for his own work

---

[151] R. at 469.
[152] R. at 470.
[153] Id.
[154] Id.
[155] Id.
[156] Id.

activities and had interaction with a supervisor anytime the work changed, generally once or twice a day.[157] The VE identified over 10,000 general assembly positions "at the light level," 4,500 inspection positions, and 3,500 in general labor positions, such as labeling, masking and bagging.[158]

Plaintiff's attorney then asked the VE to change the hypothetical to a person who had marked limitations in the ability to accept instructions and respond appropriately to criticism from supervisors.[159] The VE testified that such a hypothetical individual would not be able to perform any of the jobs described by the VE because these jobs require an ability to accept instruction.[160] A person who refused to do a job as instructed to do would not be able to maintain employment in such a job.[161]

### 4. The ALJ's Decision of October 22, 2007

After the second administrative hearing, the ALJ issued his decision on October 22, 2007. In the written decision, the ALJ evaluated plaintiff's claim for disability by following the five-step process outlined by 20 C.F.R. § 404.1520(a).

First, at step-one, the ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2007, because he had not engaged in substantial gainful activity since the alleged onset date, November 1, 2002.[162] Even though the record disclosed posted earnings of $17,600.00 in 2003 and 2004, plaintiff asserted that he had not worked since November 1, 2002, and the earnings reported in 2003 and 2004 were residuals from the services performed in plaintiff's previous medical practice.[163]

Next, at step-two, the ALJ found that plaintiff had bipolar disorder, which qualified as a

---

[157] *Id.*
[158] R. at 470-71.
[159] R. at 471.
[160] *Id.*
[161] R. at 471-72.
[162] R. at 13-14.
[163] R. at 14.

severe impairment under 20 CFR 404.1520(c).[164] In making this finding, the ALJ relied on the ME's

opinion, who testified that "the record [was] relatively consistent for some degree of a bi-polar

problem."[165] Despite finding bipolar disorder, at step-three, the ALJ found that plaintiff did not have

"an impairment or combination of impairments that meets or medically equaled one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 4041525 and

404.1526)."[166] In making this finding, the ALJ evaluated both "paragraph B" and "paragraph C"

criteria in the Regulations.

First, the ALJ found that plaintiff's mental impairment did not meet the "paragraph B"

criteria.[167] To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of

the following: marked restriction of activities of daily living; marked difficulties in maintaining social

functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated

episodes of decompensation, each of extended duration.[168] "Marked" is defined as more than moderate

but less than extreme.[169] "Repeated episodes of decompensation, each of extended duration" is defined

as either three episodes within one year or an average of once every four months, each lasting for at

least two weeks.[170]

Even though the ALJ acknowledged that Dr. De Sa Pereira's notes supported a finding that

plaintiff had marked limitations in social functioning and concentration, persistence and pace, the

ALJ instead chose to rely on the testimony of the ME and found that plaintiff did not have marked

---

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] R. at 15.

[168] 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[169] *Id.*

[170] *Id.*

limitations in any of the impairments listed in the "paragraph B" criteria.[171] The ALJ found that plaintiff had only mild restriction in activities of daily living because he left home on a daily basis alone and was "capable of completing routine activities of daily living."[172] In social functioning, the ALJ found that plaintiff had moderate difficulties because he was "capable of interacting appropriately in brief social contacts" but had difficulties maintaining on-going relationships.[173] The ALJ then found that plaintiff had moderate difficulties in maintaining concentration, persistence, or pace because he "demonstrated difficulties with sustained focused attention and concentration."[174] The ALJ did not find that plaintiff experienced episodes of decompensation.[175] The ALJ added that plaintiff did not demonstrate "any loss of adaptive functioning or exacerbations in symptoms or signs that would ordinarily required [sic] increased treatment or a less stressful situation."[176] Finding that plaintiff's mental impairment did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the ALJ concluded that the "paragraph B" criteria was not satisfied.[177]

Next, the ALJ found that plaintiff's mental impairment did not meet the "paragraph C" criteria.[178] To satisfy the "paragraph C" criteria the claimant must have a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, plus one of the following: (1) repeated episodes of

---

[171] R at 14-15.
[172] R. at 15.
[173] Id.
[174] Id.
[175] Id.
[176] Id.
[177] Id.
[178] Id.

decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.[179]

The ALJ stated that in this case "the evidence faile[d] to establish the presence of 'paragraph C' criteria."[180] Besides the lack of evidence, the ALJ provided no further explanation as to why the paragraph C criteria was not satisfied. The ALJ only noted that he relied on the opinion of the ME when finding that plaintiff's mental impairment did not meet the "paragraph B" and "paragraph C" criteria in the Regulations.[181]

Before considering step-four, the ALJ determined plaintiff's RFC. The ALJ found that plaintiff had an RFC to perform a full range of work at all exertional levels but with certain nonexertional limitations, including an inability to maintain the attention and concentration necessary for detailed or complex tasks.[182] The ALJ also found moderate limitations (meaning that the activity is impacted, but not precluded) in the following abilities: (1) to interact appropriately with the general public and co-workers less than occasionally (up to one-third of the day) and for five to ten minutes on each occasion; (2) to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; (3) to work in coordination with or in proximity to others without being distracted by them; (4) to respond appropriately to changes in the work setting; (5) to accept instructions; and (6) to respond appropriately to criticism from supervisors.[183]

---

[179] 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[180] R. at 15.

[181] *Id.*

[182] R. at 16.

[183] *Id.*

The ALJ then moved to his credibility assessment. He noted that in making the RFC finding, he considered "opinion evidence" and "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."[184] So to determine credibility, he noted the required two-step review: whether a medically determinable physical or mental impairment exists that could reasonably be expected to produce plaintiff's pain or other symptoms, and; an evaluation of the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limited plaintiff's ability to do basic work activities.[185] The ALJ also listed a number of factors from 20 C.F.R. 404.1529(c) that must be considered, in addition to the objective medical evidence, when assessing the credibility of the claimant's statements.[186] Then the ALJ summarized, for several pages, the evidence of record, including the medical evidence, Dr. De Sa Pereira's records, and the testimonies of the ME and of plaintiff from both administrative hearings.[187]

Following this overview of the evidence, the ALJ determined that plaintiff's "medically determinable impairment could reasonably be expected to produce the alleged symptoms," but plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible."[188] The ALJ further stated that the limitations in the RFC accommodate the plaintiff's allegations "to the greatest extent reasonably supported by the evidence" and added that

> [t]he medical evidence as a whole does not indicate limitations greater than those in the residual functional capacity and the subjective record does not support the claimant's allegations of complete disability. The undersigned first notes that the

[184] *Id.*
[185] *Id.*
[186] R. at 17.
[187] R. at 17-21.
[188] R. at 21.

claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. The record shows that the treatment the claimant has received for his alleged impairment has been essentially routine and/or conservative in nature, and has been relatively effective in controlling any symptoms. Also notable in judging the credibility of the claimant's allegations is the fact that the claimant described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

As for the opinion evidence, with regard to the opinions expressed by Dr. De Sa Pereira, the doctor's opinion is inconsistent with the other evidence of record and her own reports fail to reveal the type of significant clinical abnormalities one would expect if the claimant were, in fact, disabled...[189]

We point out that the ALJ found that Dr. De Sa Pereira's opinions were inconsistent with the other evidence of record, but he did not specifically address this weakness.[190] The ALJ added that "the course of treatment pursued by [plaintiff's] treating sources has not been consistent with what one would expect if the claimant were truly disabled."[191] The ALJ noted that he gave "great weight to the testimony of the medical expert whose knowledge and expertise were essential in assisting the [ALJ] in the evaluation of the claimant's mental impairment."[192] Finally, the ALJ stated that the RFC conclusions made by the physicians employed by the State Disability Determination Services also supported a finding of "not disabled."[193] The ALJ noted that although the State physicians were non-examining and, as a general matter their opinions would not be given as much weight as the opinion of Dr. De Sa Pereira, those opinions deserved "some weight, particularly in a case like this in which there exist[ed] a number of other reasons to reach similar conclusions."[194]

At step-four, the ALJ evaluated whether plaintiff was able to perform any past relevant work. Relying on the testimony of the VE, the ALJ found that plaintiff was unable to perform any

---

[189] R. at 22.
[190] *Id.*
[191] *Id.*
[192] *Id.*
[193] *Id.*
[194] *Id.*

past relevant work.[195] Finally, at step-five, the ALJ evaluated whether plaintiff was able to perform any other work that existed in significant numbers in the national economy. In making this evaluation, the ALJ again relied on the testimony of the VE.[196] The ALJ found that the VE's testimony was consistent with the information contained in the DOT and concluded that plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.[197] Therefore, the ALJ decided that based on the application for DIB, plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act.

## IV.   Standard of Review

The Court reviews the ALJ's conclusions of law under a de novo standard of review, but the ALJ's findings of facts are entitled to deference.[198] In reviewing the ALJ's factual findings, this Court will review the record as a whole, but will not reweigh the evidence or resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.[199] This Court will affirm the ALJ's decision as long as it is supported by substantial evidence.[200] "Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision."[201] Where reasonable minds differ over conflicting evidence the Commissioner is responsible for determining whether a plaintiff is disabled.[202] However, the Commissioner's decision is not entitled to unlimited judicial deference. In rendering the decision, an ALJ must minimally

---

[195] R. at 22.

[196] R. at 23.

[197] *Id.*

[198] *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).

[199] *Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005); *Powers v. Apfel*, 207 F.3d 431, 434-35 (7th Cir. 2000).

[200] 42 U.S.C. § 405(g); *Haynes*, 416 F.3d at 626.

[201] *Prochaska*, 454 F.3d at 734.

[202] *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

articulate his reasons for crediting or discrediting evidence of disability.[203] Although the ALJ must build a logical bridge from the evidence to his conclusion, he does not need to provide a "complete written evaluation of every piece of testimony and evidence."[204] The Court conducts a critical review of the evidence and will not uphold the ALJ's decision when it lacks evidentiary support or an adequate discussion of the issues.[205]

## V.       Analysis

In his motion for summary judgment, plaintiff argues that reversal of the Commissioner's decision is warranted because the ALJ failed to properly: (1) identify whether there are a significant number of jobs available that plaintiff can perform; (2) resolve conflicts between the VE's testimony and the DOT; (3) analyze the opinion of plaintiff's treating psychiatrist, Dr. De Sa Pereira; (4) evaluate plaintiff's credibility and medical treatment; and (5) analyze plaintiff's physical problems and his limitation in concentration, persistence and pace. As previously noted, the Commissioner initially filed a motion to remand acknowledging that the ALJ's decision was unclear as to whether there were a significant number of jobs available that plaintiff could perform. The Commissioner had also suggested that, on remand, the ALJ ask the VE whether his testimony was consistent with the DOT. Because we denied that motion, finding that plaintiff was entitled to judicial review of the "entirety" of the ALJ's decision, we now address plaintiff's additional arguments.

### A.       The Number of Jobs Available to Plaintiff and the Consistency of the VE's Testimony With the DOT.

First, we acknowledge that the Commissioner conceded that the VE's testimony was unclear with regard to the number of jobs available that plaintiff could perform. The VE found that plaintiff

---

[203] *Clifford v. Apfel*, 227 F.3d 836, 869 (7th Cir. 2000).
[204] *Haynes*, 416 F.3d at 626 (7th Cir. 2005); *see also Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).
[205] *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

could perform simple, unskilled work at the light exertional level.[206] The VE did not, however, specify how many such jobs at the light exertional level were available. (Specifically, the VE identified over 10,000 general assembly unskilled positions and 8,000 inspection, labeler, masker and bagger unskilled positions, but did not identify exactly how many of the 8,000 inspection, labeler, masker and bagger positions were at the light level of exertion.)[207] As recommended by the Commissioner, on remand the ALJ should identify how many jobs may be available to plaintiff at the light or medium level of exertion.

The second point conceded by the Commissioner is that, upon remand, the ALJ should ask the VE if his testimony was consistent with the DOT. Plaintiff claims that his inability to interact with others for more than occasionally and for more than five to ten minutes at a time precludes him from obtaining a full-time job or, at the very least, is inconsistent with the DOT. According to SSR 00-4p, when a VE provides evidence about the requirements of a job or occupation, an ALJ has an affirmative responsibility to ask about any possible conflict between the VE's testimony and information provided in the DOT.[208] In these situations, the ALJ should: (1) ask the VE if the evidence he or she has provided conflicts with information provided in the DOT; and (2) if the VE's evidence appears to conflict with the DOT, the ALJ should obtain a reasonable explanation for the apparent conflict.[209] On remand, then, the ALJ is to determine whether the VE's testimony is consistent with the DOT, taking into account plaintiff's inability to interact with others more than occasionally and for more than five to ten minutes at a time.

---

[206] R. at 470.

[207] R. at 470-71.

[208] Policy Interpretation Ruling : Titles II And XVI: Use Of Vocational Expert And Vocational Specialist Evidence, And Other Reliable Occupational Information In Disability Decisions, 2000 WL 1898704, 1; *see also Prochaska*, 454 F.3d at 735.

[209] *Id.*

## B.     The ALJ's Analysis of Dr. De Sa Pereira's Opinion

Moving to the disputed arguments, plaintiff first claims that the ALJ failed to properly

analyze Dr. De Sa Pereira's opinion, including the weight given to her opinion. Plaintiff alleges that

the ALJ failed to explain how Dr. De Sa Pereira's treatment notes were inconsistent with her opinion

and with other evidence of record. In connection with this argument, plaintiff alleges that the ALJ

failed "to recontact the doctor" if he needed further explanation for Dr. De Sa Pereira's opinion.

Plaintiff then argues that the ALJ should have adopted Dr. De Sa Pereira's finding that plaintiff had

an affective disorder, pointing to the ALJ's incorrect use of the standard, where the ALJ states that

there is no evidence of "a chronic organic mental disorder."[210]

### 1.     The ALJ's Analysis of Dr. De Sa Pereira's Treatment Notes

The ALJ discounted the opinion of Dr. De Sa Pereira, plaintiff's treating psychiatrist, and

gave "great weight" to the opinion of the ME and "some weight" to the opinion of the state agency

psychiatrist.[211]  Because controlling weight was not given to the opinion of Dr. De Sa Pereira, we

must look to see whether the ALJ minimally articulated the reasoning for assigning the weights he

did.

A treating physician's opinion regarding the nature and severity of a medical condition is

entitled to controlling weight if it is well supported by medical findings and consistent with other

substantial evidence in the record.[212] However, when a treating physician's opinions are internally

inconsistent, inconsistent with other evidence of record, or based solely on claimant's subjective

opinions, an ALJ must consider the evidence of record and decide how much weight to give to the

---

[210] R. at 15.

[211] R. at 22.

[212] 20 C.F.R. § 404.1527(d)(2); *Clifford*, 227 F.3d at 870.

opinion of the treating physician.[213] The reason to give a treating physician's opinions controlling weight is because the treating physician has been able to observe a claimant personally, over an extended period of time.[214] But there is also a reason to give less weight to the treating physician's opinion simply because his or her opinion may be unreliable due to the treating physician being overly sympathetic with the patient and quick to find a disability.[215]

To account for these competing concerns, the regulations set forth a list of factors to be considered when deciding how much weight to give.[216] These factors include: (1) length, nature, and extent of the relationship between the physician and the claimant; (2) whether the physician supported his or her opinions with sufficient explanations (i.e. supportability); and (3) whether the physician's opinion is consistent with the record as a whole (i.e. consistency).[217] In analyzing these factors, an ALJ must at least "minimally articulate" the reasoning behind it.[218] While an ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision.[219] Most importantly, he must build an accurate and logical bridge from the evidence to his conclusion.[220]

With regard to the first factor - length, nature, and extent of the relationship between Dr. De Sa Pereira and plaintiff - the Commissioner argues that the ALJ considered the treatment relationship by noting that Dr. De Sa Pereira was "plaintiff's treater." However, evaluation of a treatment relationship requires more than simply noting that a physician was a "treater." Evaluating

---

[213] *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

[214] *Id.* at 625.

[215] *Id.*

[216] *See* 20 C.F.R. §§ 404.1527(d)(2)(I)-(ii), 404.1527(d)(3), 404.1527(d)(5); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

[217] *See* 20 C.F.R. §§ 404.1527(d)(2)(I)-(ii), 404.1527(d)(3), 404.1527(d)(5); *Moss*, 555 F.3d at 561.

[218] *Schmidt*, 496 F.3d at 842.

[219] *Clifford*, 227 F.3d at 872.

[220] *Id.*

a treatment relationship requires consideration of the nature and extent of the relationship, including the treatments provided by the source and the kind and extent of examinations performed.[221] Here, Dr. De Sa Pereira has been plaintiff's treating psychiatrist since 1996 and consistently diagnosed him with bipolar disorder, yet the ALJ makes no mention of these facts nor gives any explanation as to how these facts weighed in favor of, or against, giving controlling weight to Dr. De Sa Pereira's opinion.[222]

Moving to the supportability factor, the Court finds nothing in the ALJ's decision that could reasonably be construed to be an evaluation of this factor. The Commissioner argues that "the ALJ explained that Dr. De Sa Pereira's opinion was not supported by her own treatment notes,"[223] and cites to the record in an attempt to provide the reasoning that is missing from the ALJ's decision. However, this argument is precluded by the *Chenery* doctrine "which forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced."[224]

Further, in evaluating the supportability factor, the ALJ failed to consider the unique nature of mental illness cases. Specifically, the fact that a treating physician's treatment notes do not fully corroborate his or her opinion is not a ground for rejecting the opinion in a case of severe mental illness. Plaintiff's argument relies on *Bauer v. Astrue*.[225] In *Bauer*, the ALJ discounted the treating physician's opinion as being unsupported by her treatment notes based on the fact that the treating physician concluded that the plaintiff could not work full time, despite a variety of "hopeful remarks" in her notes.[226] The court in *Bauer* noted that the ALJ overlooked the point that,

---

[221] *See* 20 C.F.R. § 404. 1527(d)(2).

[222] R. at 179.

[223] Def.'s Mem. in Resp. to Pl.'s Mot. for Summ. J. at 3.

[224] *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (citing *SEC v. Chenery Corp*., 318 U.S. 80, 87-88 (1943)).

[225] 532 F.3d 606, 608 (7th Cir. 2008).

[226] *Bauer,* 532 F.3d at 608.

[a] person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job. That is likely to be the situation of a person who has bipolar disorder that responds erratically to treatment.[227]

As in *Bauer*, plaintiff is a person who has a chronic psychiatric disease, who is under continuous treatment with heavy drugs, who is likely to have good days and bad days and who is likely to show some improvement on occasion.[228] Accordingly, on remand, the ALJ should evaluate the supportability of Dr. De Sa Pereira's opinion taking into account the nature of plaintiff's mental illness.

As for the consistency factor, the ALJ made only one conclusory statement that Dr. De Sa Pereira's opinion was "inconsistent with the other evidence of record."[229] But the ALJ did not then explain what was inconsistent. He only added that her reports did not evidence abnormalities that, apparently, according to him, would be expected if one were indeed disabled. As to the Commissioner's arguments - that a finding of inconsistency is supported by the record - these arguments are again precluded by *Chenery* due to a lack of support in the ALJ's decision.[230] The Commissioner simply refers to state agency physicians' opinions that differed from Dr. De Sa Pereira's findings (where records noted that plaintiff could perform certain tasks). But the ALJ himself did not explain that this was why he found plaintiff's treating physician's reports to be

---

[227] *Id.* (citing Ronald C. Kessler et al., *The Prevalence and Effects of Mood Disorders on Work Performance in a Nationally Representative Sample of U.S. Workers*, 163 Am. J. Psychiatry 1561-68 (2006)); *see also Kangil v. Barnhart*, 454 F.3d 627 (7th Cir. 2006) (noting that "bipolar disorder is episodic"); *Larson v. Astrue*, 615 F.3d 744, 751(7th Cir. 2010) (noting that "symptoms that 'wax and wane' are not inconsistent with a diagnosis of recurrent, major depression.").

[228] *See Bauer,* 532 F.3d at 608.

[229]R. at 22.

[230] *See SEC v. Chenery Corp.*, 318 U.S. at 87-88 (noting that an agency's lawyers cannot defend the agency's decision on grounds that the agency itself had not embraced).

"inconsistent." We are left with no choice, then, but to remand for further clarification on this point.[231]

## 2. The ALJ's Obligation to "Recontact the Doctor"

In connection with the argument that the ALJ failed to properly analyze Dr. De Sa Pereira's opinion, plaintiff alleges that the ALJ was required to "recontact the doctor" if he needed further explanation for her opinion. In his argument, plaintiff relies on *Barnett v. Barnhart*.[232] In *Barnett*, the ALJ disregarded the treating physician's opinion that the plaintiff suffered from recurrent seizures and was disabled because the opinion was unsupported and inconsistent with the medical record.[233] However, the *Barnett* court held that even if a medical opinion on an ultimate issue of disability "is not entitled to controlling weight, the ALJ must consider the opinion and should recontact the doctor for clarification if necessary."[234] In *Barnett*, the court held that the ALJ had a duty to solicit additional information to clarify the opinion because the medical support for it "[was] not readily discernable."[235] The ALJ had a mechanism to rectify the problem by subpoenaing or further questioning the physician.[236]

Similar to *Barnett*, here the ALJ discounted the opinion of Dr. De Sa Pereira - that plaintiff's bipolar disorder was disabling - without much explanation.[237] The ALJ determined that Dr. De Sa Pereira's opinion was unsupported and inconsistent with the record and, thus, gave controlling

---

[231]*See Martinez v. Astrue,*2011 WL 148810, *3 (7th Cir. 2011)(noting that the ALJ perhaps forgot "that he was required to give 'good reasons' for not giving the well-supported opinion of a treating physician 'controlling weight.'").

[232] 381 F.3d 664, 669 (7th Cir. 2004).

[233] *Id.*

[234] *Id.*

[235] *Id.*

[236] *Id.*

[237] R. at 22.

weight to the opinion of the ME.[238] The ME, however, admitted that he was not able to read a portion of Dr. De Sa Pereira's notes and not able to understand another portion of them.[239] For example, he did not know what she meant by calling plaintiff "grandiose."[240] The ALJ was, therefore, also left with only a portion of her notes explained by the ME. Because we know that the ALJ relied heavily on the opinion of the ME, but do not know precisely why the ALJ discounted Dr. De Sa Pereira's opinion, there is reason to believe that "recontacting the doctor" was a necessary step. On remand, depending on clarifications offered by the ALJ, it may be appropriate to subpoena Dr. De Sa Pereira or submit additional questions to her.

### 3.    The ALJ's Error in Stating "Organic Mental Disorder"

Plaintiff further argues that the ALJ should have adopted the treating doctor's finding that plaintiff had an affective disorder. Plaintiff bases this argument partly on the fact that, to the extent the ALJ stated "organic mental disorder" instead of "affective mental disorder" when evaluating the "paragraph C" criteria, he used the wrong standard. The Court agrees with plaintiff that there is a significant difference between "organic mental disorder" and "affective mental disorder." "Organic mental disorder" is a psychological, cognitive, or behavioral abnormality associated with transient or permanent dysfunction of the brain, usually characterized by the presence of an organic brain syndrome.[241] "Affective mental disorders" is a group of mental disorders characterized by a disturbance in mood.[242] Accordingly, if the ALJ relied on the standard of "organic mental disorder," he erred. However, the Court notes that despite the use of the term "organic" rather than "affective," the ALJ appears to have otherwise applied the proper law when evaluating the "paragraph C"

---

[238] *Id.*

[239] R. at 460, 465.

[240] *Id.*

[241] Stedmans Medical Dictionary 570 (28th ed. 2006).

[242] *Id.* at 567.

criteria. But because remand is inevitable in this case, the ALJ may clarify the precise standard he relied on when evaluating the "paragraph C" criteria.

### C.     The ALJ's Evaluation of Plaintiff's Credibility and Medical Treatment

Plaintiff argues two points here: that the ALJ failed to properly analyze plaintiff's credibility, and that the ALJ failed to explain what he was relying on when he determined that plaintiff's medical treatment was not what one would expect for "a totally disabled individual"[243] First, we agree that the ALJ erred in using boilerplate language, without more, when he found that plaintiff's statements were "not entirely credible."[244] Without specific reasons for his finding, the Court is left to wonder what weight the ALJ gave to the plaintiff's testimony and the reasons for that weight. Under Social Security Ruling 96-7p, the ALJ's determination or decision regarding a claimant's credibility,

> must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.[245]

It is not sufficient for the ALJ to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."[246] In evaluating a claimant's credibility, the ALJ should consider the claimant's daily activities; the location, duration, frequency and intensity of the symptoms; factors that precipitate or aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication; treatment (other than medication) that the individual receives for relief of symptoms, and the medical evidence.[247] It is also not enough for the

---

[243] R. at 22.

[244] R. at 21.

[245] Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186, at *2 (SSR 96-7p Jul 2, 1996).

[246] *Zurawski*, 245 F.3d at 887.

[247] *Id.*; 20 C.F.R. § 404.1529(c)(3).

ALJ simply to recite these factors.[248]

In defending the ALJ's evaluation of plaintiff's credibility, the Commissioner argues that the ALJ discussed the credibility factors described in the regulations and then detailed certain facts that would support his conclusion.[249] But the ALJ's recitation of these facts does not tell us, or plaintiff, how they weighed for or against plaintiff's credibility. The ALJ simply repeated the testimony and evidence, without providing any specific application of those facts to the regulations.[250] And again, the argument proffered by the Commissioner - that the facts listed in the opinion go to the credibility analysis - is an argument we cannot rely on here, as it is prohibited by *Chenery*.[251] We, therefore, must remand on this issue.

Moving to the evaluation of plaintiff's medical treatment, plaintiff asserts that the ALJ did not explain what medical treatment would be expected of a totally disabled individual, yet he stated that plaintiff did not receive treatment that "one would expect from a totally disabled individual."[252] In defending the ALJ's decision, the Commissioner relies on *Bauer, supra*, where the plaintiff was hospitalized for bipolar disorder.[253] The Commissioner argues that it is common knowledge that individuals with mental disabilities "often require psychiatric hospitalization."[254]

But the "paragraph B" criteria in the Regulations do not require hospitalization for bipolar disorder to be found to be a disabling condition.[255] And the Court is troubled with the ALJ's conclusion - that plaintiff's treatment is not "what one would expect for a totally disabled

---

[248] *Id.*

[249] R. at 17-21.

[250] *Martinez,* 2011 WL 148810 at *3 (criticizing the ALJ's opinion where there was no explanation as to which of claimant's statements were not entirely credible).

[251] *See SEC v. Chenery Corp.,* 318 U.S. at 87-88.

[252] R. at 22.

[253] *Bauer,* 532 F.3d at 606.

[254] Def.'s Mem. in Resp. to Pl.'s Mot. for Summ. J. at 9.

[255] 20 C.F.R. Pt. 404, Subpt. P, App. 1.

individual" - without support or explanation.[256]  "[A]n ALJ cannot play the role of doctor and interpret medical evidence."[257] The courts insist that "an ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record."[258] Here, the ALJ made further questionable comments that plaintiff "described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations" and that Dr. De Sa Pereira's reports "fail[ed] to reveal the type of significant clinical abnormalities one would expect if the claimant were, in fact, disabled."[259] Whether the type of a medical treatment plaintiff received, plaintiff's daily activities, or Dr. De Sa Pereira's reports are adequate for a finding of a disabling bipolar disorder, are a matter for medical judgment. The ALJ may be correct that a disabling bipolar disorder would result in abnormalities, symptoms or limitations more severe than those experienced by plaintiff. The problem is, the ALJ is not qualified, on his own, to make such determinations.[260] There must be some evidence to support his opinion, and the ALJ must include that support in his decision.

### D.    The ALJ's Analysis of Plaintiff's Physical Problems and His Limitation in Concentration, Persistence, and Pace

Plaintiff argues that the ALJ failed to properly analyze his physical problems that were correlated to his bipolar disorder. Plaintiff also argues that the ALJ failed to  properly account for his limitation in concentration, persistence, or pace. The Commissioner asserts that first, plaintiff himself testified that he was not limited by other medical problems and, second, the ALJ properly relied on the ME's assessment of plaintiff's limitations.

---

[256] R. at 22.

[257] *Liskowitz v. Astrue*, 559 F.3d 736, 741 (7th Cir. 2009).

[258] *Clifford*, 227 F.3d at 870.

[259] *Id.*

[260] *See Liskowitz*, 559 F.3d at 741 (noting that "[p]erhaps the ALJ is right that disabling rheumatoid arthritis would result in significant joint swelling. But we do not know this; and the ALJ does not know either").

### 1.     The ALJ's Analysis of Plaintiff's Physical Problems

Plaintiff asserts that the ALJ "erred in failing to address other significant evidence in the record, indicative of some degree of physical problem."[261] According to plaintiff, the record revealed that he had a lung age of 114 years, and that he was diagnosed with diverticulosis, internal hemorrhoids, and hypothyroidism.[262] Plaintiff argues that while such impairments were not found to be severe, considered in combination with each other and in combination with plaintiff's bipolar disorder, they could change the outcome of the claim.[263] In response, the Commissioner argues that plaintiff did not allege or testify that he had any limitations because of these conditions.

Here, the Court agrees with the Commissioner. While an ALJ must base his decision on a consideration of all the *relevant* evidence, the  ALJ  need not discuss every piece of evidence in the record.[264] Plaintiff's testimony evidenced that he was not limited by his other physical problems and thus they were not relevant. For example, plaintiff himself testified that his thyroid condition was stabilized by medication and that he was not aware of any side effects from his medication.[265] With regard to his other physical problems, when asked whether he had "any other physical ailments or difficulties"  that the ALJ was not aware of from the record, plaintiff responded "no" and added that he was "fortunately healthy."[266] We, therefore, find the ALJ adequately addressed plaintiff's additional physical problems.

---

[261] Pl's Mem. in Supp. of his Mot. for Summ. J. at 12.

[262] R. at 187, 201, 258, 271, 273, 277.

[263] *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (noting that the ALJ needed to consider the aggregate effect of the plaintiff's entire constellation of ailments-including those impairments that in isolation were not severe); *see also Parker v. Astrue*, 597 F.3d 920, 923 (7th Cir. 2010) (noting that the court made an "elementary error" by failing to consider the cumulative effect of non-disabling impairments in exacerbating the problems created by chronic severe pain).

[264] 20 C.F.R. § 404.1527(b); *Herron*, 19 F.3d at 333; *Golembiewski*, 322 F.3d at 916-17; *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2007).

[265] R. at 455-56.

[266] R. at 424.

## 2. The ALJ's Analysis of Plaintiff's Limitation in Concentration, Persistence, and Pace

Plaintiff next argues that the ALJ failed to properly account for his limitation in concentration, persistence, and pace when the ALJ limited him to simple unskilled work. In support of his argument, plaintiff relies on *Stewart v. Astrue*.[267] Plaintiff's reliance on *Stewart*, however, is misplaced. Similar to this case the plaintiff in *Stewart* was diagnosed with bipolar disorder.[268] The ALJ in *Stewart* found that the plaintiff "retained the RFC to perform work involving simple, routine tasks so long as she was not required to lift more than twenty pounds at a time or carry objects weighing over ten pounds or constantly interact with co-workers."[269] The *Stewart* court held that by restricting the hypothetical to simple, routine tasks, the ALJ did not adequately account for the plaintiff's limitation in concentration, persistence, and pace.[270] One reason the *Stewart* court found the hypothetical deficient was that it failed to include restrictions on the plaintiff's ability to understand instructions or respond to work pressures.[271]

However, unlike *Stewart*, the ALJ here did not restrict the hypothetical to "simple, routine tasks." In fact, here the ALJ specifically included a limitation on plaintiff's ability to respond appropriately to changes in the work setting and to accept instructions.[272] Moreover, unlike the simple one-sentence hypothetical in *Stewart*, the ALJ here created a hypothetical with at least eight limitations, some of which could also be interpreted as accommodating plaintiff's limitation in concentration, persistence, and pace.[273] For example, the ALJ included in the hypothetical to the VE

---

[267] 561 F.3d 679 (7th Cir. 2009).
[268] *Id.* at 681.
[269] *Id.* at 682.
[270] *Id.* at 684-85.
[271] *Id.* at 685.
[272] R. at 16, 470.
[273] R. at 469-70.

a limitation in plaintiff's ability to maintain attention and concentration necessary for detailed or complex tasks on a sustained basis.[274] Thus, unlike the ALJ in *Stewart* - who restricted the hypothetical to simple, routine tasks - in our case, the VE concluded that plaintiff was capable of performing simple, unskilled work after considering plaintiff's limitations.

In connection with the argument above, plaintiff also alleges that he would be placed under "much more stress" if he had to perform unskilled work because of "the demeaning nature of the work and the boredom associated with it."[275] Plaintiff argues that the ALJ should have analyzed plaintiff's ability to perform such work in light of his lack of tolerance for people and "frustration." In response, the Commissioner argues that neither plaintiff nor Dr. De Sa Pereira, his treating psychiatrist, alleged that plaintiff would be "much more stress[ed]" by performing unskilled work.

The Court agrees with the Commissioner that, although plaintiff testified that he might not want to take instructions from someone who was less educated than he, he did not indicate that unskilled work might be stressful to him. The Court also notes that the record shows that the ALJ considered plaintiff's lack of tolerance for people when the ALJ specified in the hypothetical to the VE that plaintiff's interactions with people were limited to less than occasionally, and each interaction lasted five to ten minutes maximum. As to the issue of plaintiff's frustration, the ALJ specified in the hypothetical that plaintiff had a moderate limitation in terms of ability to respond appropriately to changes in the work setting, to accept instructions and respond appropriately to criticism from supervisors. Thus, we find that the ALJ minimally articulated his reasoning when he analyzed plaintiff's ability to perform simple unskilled work in light of his difficulty with frustration and lack of tolerance for people.

---

[274] *Id.*

[275] Pl's Mem. in Supp. of his Mot. for Summ. J. at 12.

**VI.    Conclusion**

For the reasons set forth above the Court grants plaintiff's motion for summary Judgment and remands this matter for further proceedings. On remand, the ALJ should: (1) identify the number of jobs available that plaintiff can perform; (2) identify and resolve conflicts between the VE's testimony and the DOT; (3) evaluate the weight to be given to Dr. De Sa Pereira's opinion; (4) clarify his intent to analyze "affective" rather than "organic" mental disorder when evaluating whether plaintiff's mental impairment met the "paragraph C" criteria; and (5) evaluate plaintiff's credibility [dkt. 14].

**IT IS SO ORDERED.**

**Date: February 3, 2011**

**Susan E. Cox**
**U.S. Magistrate Judge**